Filed 1/28/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JENNY FLORES et al., | B301731 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC629177) |
| v. | |
| CARSON D. LIU, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara A. Meiers, Judge. Affirmed.

Arias & Lockwood, Christopher D. Lockwood; Law Offices of Patricia A. Law and Patricia A. Law for Plaintiffs and Appellants.

Horvitz & Levy, Mark A. Kressel, Shane H. McKenzie; Neil, Dymott, Frank, McCabe & Hudson, Hugh A. McCabe and Dane J. Bitterlin for Defendant and Respondent.

\* \* \* \* \* \*

A surgeon competently performed a gastric re-sleeving surgery on a woman. She subsequently sued him for negligence in recommending gastric re-sleeve surgery as a viable course of treatment and in not obtaining her informed consent to the surgery. This appeal presents two questions: (1) when can a physician be sued for negligently recommending a course of treatment, and (2) does the patient's informed consent negate any liability for a negligent recommendation? On the first question, we hold that a physician may be liable for negligently recommending a course of treatment if (1) that course stems from a misdiagnosis of the patient's underlying medical condition, or (2) all reasonable physicians in the relevant medical community would agree that the probable risks of that treatment outweigh its probable benefits. On the second question, we hold that a patient's informed consent to a negligently recommended course of treatment does not negate the physician's liability for his negligence in recommending it. Although the trial court in this case erred by instructing the jury that the woman's informed consent negated any liability for the surgeon's recommendation, this error did not prejudice the woman's case because her negligent recommendation theory should never have gone to the jury in the first place. We accordingly affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *Plaintiff's initial condition*

In 2011, Jenny Flores (plaintiff) was 33 years old. At a height of 5 feet 2 inches tall and a weight of 315 pounds, she suffered from morbid obesity. By that time, her efforts to lose weight through diet alone had failed.

**B.** *Medical consultation and surgeries*

1. *Consultation*

In July 2011, plaintiff consulted with Dr. Carson Liu (Dr. Liu), a leading and experienced bariatric surgeon, about surgeries that might assist her with her weight loss efforts. Consistent with his "multi-disciplinary approach" to bariatric medicine, Dr. Liu did a full medical work-up of plaintiff's condition and also referred her to a psychologist and a nutritionist.

Based on this interdisciplinary work-up, Dr. Liu correctly diagnosed plaintiff as suffering from morbid obesity due to overeating rather than any psychological issue or any physiological, hormonal imbalance. He presented plaintiff with three surgery options: (1) gastric lap band surgery, which entails inserting a ring around the patient's stomach that can be cinched tighter to limit stomach capacity and thus decrease hunger, (2) gastric sleeve surgery, which entails removing a portion of the patient's stomach to make it smaller, and (3) gastric bypass surgery, which entails creating a small pouch from the patient's existing stomach and connecting the new pouch to the small intestine.

2. *Gastric lap band surgery*

Because plaintiff categorically refused to consider gastric bypass surgery, Dr. Liu explained—orally and in writing—the risks of the gastric lap band surgery, which included "leakage," "bleeding" and "infection." Dr. Liu also explained—again, orally and in writing—that the gastric lap band surgery would only "*help* with diet" and that weight loss would follow only if plaintiff herself made efforts to keep her "dietary intake" "[a]ppropriate" and to "exercise." (Italics added.) Plaintiff opted for the gastric

lap band surgery and signed a patient consent form in which she consented to that surgery.

On August 15, 2011, Dr. Liu performed the gastric lap band surgery on plaintiff.

In the 16 months immediately following the surgery, and after a number of office visits to adjust the band, plaintiff was able to regulate her diet and lost a total of 73 pounds. When plaintiff lost her job in August 2013, however, she was put under stress, her healthier eating habits faltered, and she started to re-gain weight.

3.      *Gastric sleeve surgery*

In August 2013, plaintiff contacted Dr. Liu about having him perform gastric sleeve surgery on her. Dr. Liu did not refer plaintiff a second time to either a nutritionist or a psychologist because Dr. Liu and his staff had been meeting with plaintiff during all of her office visits, and those visits included "dietary consult[s]."

Dr. Liu orally explained the nature of the surgery as well as the possible risks, which included "staple line leakage, . . . bleeding, infection, and a small possibility of death." In Dr. Liu's experience, the risk of these complications was approximately 5 percent. Plaintiff agreed to the surgery and signed a patient consent form.

On August 29, 2014, Dr. Liu removed the lap band and performed the gastric sleeve surgery on plaintiff.

In the months following the surgery, plaintiff lost some weight. By July 2015, however, plaintiff was "non-compliant" with her diet and had re-gained weight.

### 4. *Gastric re-sleeve surgery*

In July 2015, plaintiff contacted Dr. Liu about further options to help her with her weight loss and Dr. Liu indicated that gastric re-sleeve surgery might be appropriate. To assess how plaintiff was able to re-gain weight even after the gastric sleeve surgery had reduced the size of her stomach, Dr. Liu conducted a "swallow test" and, from that test, confirmed his suspicion that there had been an "anatomic failure of the sleeve" that had allowed plaintiff's stomach to stretch from the size of a small banana back to the size of an eggplant. This was unusual, as Dr. Liu had performed 700 gastric sleeve surgeries but only 45 re-sleeve surgeries. However, in light of the results of the "swallow test," Dr. Liu recommended gastric re-sleeve surgery to remove a further portion of plaintiff's stomach. Because Dr. Liu had been treating plaintiff, he did not refer her out to a psychologist or nutritionist.

Dr. Liu orally explained that the risks of a gastric re-sleeve surgery were "the same" as the risks of a gastric sleeve surgery. Both surgeries carried a risk of complications, including "staple line leakage." Based on the literature at the time, Dr. Liu understood the statistical likelihood of the risk of complications to be the same for initial sleeve surgery and re-sleeve surgery— that is, 5 percent. Plaintiff agreed to the surgery and signed a patient consent form.

On August 10, 2015, Dr. Liu performed the gastric re-sleeve surgery on plaintiff. The surgery was performed competently.

Notwithstanding the competently performed surgery, the day after the surgery, one of the staple lines leaked material from plaintiff's gastroesophageal junction into plaintiff's abdominal

5

cavity, which caused sepsis, respiratory failure, and acute renal failure. Plaintiff spent several weeks in a hospital recovering.

## II. Procedural Background

### A. *Pleadings*

On August 9, 2016, plaintiff and her husband sued Dr. Liu for (1) negligence, and (2) loss of consortium.[1]

### B. *Trial*

#### 1. *Plaintiff's two theories of negligence*

In both her opening statement and closing argument at trial, plaintiff argued that Dr. Liu was negligent on two theories: (1) he was negligent for recommending gastric re-sleeve surgery because she had "zero chance" of achieving weight loss success with that surgery given her prior failures to lose weight with the gastric lap band and initial gastric sleeve surgeries, such that no reasonable "bariatric surgeon" would have recommended re-sleeve surgery, and (2) he was negligent for not obtaining her informed consent to the gastric re-sleeve surgery.

#### 2. *Expert testimony*

##### a. Plaintiff's expert

Plaintiff's expert was a bariatric surgeon.

He opined that Dr. Liu was negligent for recommending gastric re-sleeve surgery for plaintiff. He did not opine that the surgery was categorically unwarranted, as he had performed gastric re-sleeve surgeries twice before and noted that the procedure had some—but not "a lot"—"of data behind it at this

---

[1] Plaintiff also sued Dr. Liu's private medical practice, the anesthesiologist, the hospital where plaintiff was treated for the complications from the gastric re-sleeve surgery, and two of the doctors from that hospital. The trial court subsequently dismissed those defendants on summary judgment.

point." The expert nevertheless opined that Dr. Liu was negligent for recommending gastric re-sleeve surgery for plaintiff because (1) Dr. Liu did not conduct a completely new multi-disciplinary work-up, as he claimed a "majority" of bariatric surgeons would have done, and (2) the probable benefits of the re-sleeve surgery were eclipsed by the probable risks. Regarding the second reason, the expert noted that gastric re-sleeve surgery had no probable benefit for plaintiff because it had little chance of success of enabling her to lose weight given her prior failures to adhere to a dietary and exercise regimen. Conversely, the expert opined that gastric re-sleeve surgery had a risk of "complications" that was "sometimes five or ten times higher" than for gastric sleeve surgery.

Plaintiff's expert also opined that Dr. Liu had not obtained plaintiff's informed consent to the gastric re-sleeve surgery because the surgery was "more risky than the first time operation," yet Dr. Liu told her that the risk of leakage for both surgeries was the same.

b. Dr. Liu's expert

Dr. Liu's expert was also a bariatric surgeon.

He opined that Dr. Liu acted reasonably in recommending the gastric re-sleeve surgery for plaintiff. Like plaintiff's expert, he opined that gastric re-sleeve surgery is sometimes warranted, and he had also performed this surgery in his practice. The expert further opined that the surgery was appropriate in this case because (1) no further work-up from a psychologist or dietitian was required in the absence of any "contraindications" warranting further study, and none appeared here, and (2) reasonable bariatric surgeons could conclude that the probable benefits of the surgery outweighed the probable risks.

7

Regarding plaintiff's informed consent, Dr. Liu's expert agreed with plaintiff's expert that the risk of complications from a re-sleeve is about 10 times higher than for initial sleeve surgeries, but further explained that the risk of complications went from 0.5 percent (for the initial sleeve surgery) to 5 percent (for the re-sleeve surgery).

3.   *Jury instructions*

The trial court instructed the jury on both theories of negligence advanced by plaintiff—namely, that Dr. Liu was liable for negligence if (1) "he fail[ed] to use the level of skill, knowledge, and care" in recommending gastric re-sleeve surgery "that other reasonably careful surgeons would use in similar circumstances," or (2) he did not "give" plaintiff "as much information" as "a reasonable person would consider important in deciding to" have gastric re-sleeve surgery.

4.   *Jury note and response*

During deliberations, the jury sent out the following note: "Is the plaintiff required to prove both medical negligence and failure to obtain informed consent, or is the plaintiff only required to prove one claim?"

After ruling that "an adequate [informed] consent is going to cut off liability for an erroneous recommendation," the court gave the jury a supplemental instruction. As pertinent here, the court instructed that:

"If your finding is that Dr. Liu was medically negligent in the course of treatment and the recommendation that he made that [plaintiff] have th[e] [gastric re-sleeve] surgery, he would not be liable for that negligent error [on] his part if she gave a fully informed consent . . . ."

8

5.     *Verdict*

Within hours of receiving the supplemental instruction, the jury returned an 11-1 verdict finding that Dr. Liu was "not negligent."

C.     ***Judgment and appeal***

Following the entry of judgment, plaintiff filed this timely appeal.

## DISCUSSION

Plaintiff argues that the trial court's supplemental instruction was incorrect because a patient's informed consent in agreeing to a recommended course of treatment does *not* cut off liability for negligently recommending that treatment in the first place.  Trial courts are duty-bound to give supplemental instructions if additional guidance is necessary to give the jury "'a full and complete understanding of the law applicable to the facts'" (Code Civ. Proc., § 614; *Bartosh v. Banning* (1967) 251 Cal.App.2d 378, 387; *Eng v. Brown* (2018) 21 Cal.App.5th 675, 706, fn. 9), but those supplemental instructions—like all jury instructions—must correctly convey the law (*People v. Romero* (2008) 44 Cal.4th 386, 425; *People v. Alexander* (2010) 49 Cal.4th 846, 931).  We must therefore ask two questions: (1) was the trial court's supplemental instruction correct, and if not, (2) has plaintiff established a reasonable probability that the incorrect instruction prejudiced her case?  (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069; *Morales v. 22nd Dist. Agricultural Assn.* (2016) 1 Cal.App.5th 504, 524-525 (*Morales*); see generally Cal. Const., art VI, § 13.)  Our review of each question is de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579 [instructional error]; *Morales*, at pp. 524-525 [prejudice].)

9

**I.    Does a Patient's Informed Consent to a Course of Treatment Insulate a Physician from Liability for Negligently Recommending that Treatment?**

**A.    *A physician's liability for negligence***

Like any plaintiff suing for negligence, a patient suing her physician for negligence must establish that (1) the physician owed her a duty, (2) he breached that duty, (3) there was "a proximate causal connection between [his] negligent conduct and the resulting injury," and (4) "actual loss or damage resulting from the [physician's] negligence." (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1082 (*Burgess*); *Budd v. Nixen* (1971) 6 Cal.3d 195, 200 (*Budd*), superseded on other grounds by Code Civ. Proc., § 340.6; see generally *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1158 [elements of negligence, generally].)

This case turns on the interrelationship between two duties of a physician—namely, a physician's duty of care and a physician's duty to obtain his patient's informed consent to medical procedures.  The existence and scope of these duties present questions of law subject to our independent review. (*Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1083 (*Vasilenko*).)

1.    *The physician's duty of care*

"Civil Code section 1714, subdivision (a) 'establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others.'" (*Vasilenko, supra*, 3 Cal.5th at p. 1083, quoting Civ. Code, § 1714, subd. (a); *Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 837.)  When applied to physicians, this duty of care imposes a duty "to use such skill, prudence and diligence as other members of his profession commonly possess and exercise." (*Burgess, supra*, 2 Cal.4th at p. 1077; *Turpin v. Sortini* (1982) 31 Cal.3d 220, 229;

10

*Budd, supra*, 6 Cal.3d at p. 200.)  As pertinent here, this duty of care applies not only to the physician's "actual performance or administration of treatment," but also to his "choice" of which courses of treatment to recommend (or not recommend) to a patient.  (*Rainer v. Community Memorial Hosp.* (1971) 18 Cal.App.3d 240, 260 (*Rainer*) ["negligence in choice of methods of treatment" is actionable]; *Vandi v. Permanente Medical Group, Inc.* (1992) 7 Cal.App.4th 1064, 1069-1071 (*Vandi*) ["failure to recommend a procedure must be addressed under ordinary medical negligence standards"]; *Atkins v. Strayhorn* (1990) 223 Cal.App.3d 1380, 1388 [same]; *Jamison v. Lindsay* (1980) 108 Cal.App.3d 223, 231 [same]; *Schiff v. Prados* (2001) 92 Cal.App.4th 692, 701 (*Schiff*) [same].)

A physician violates his duty of care to a patient if he recommends a course of treatment (1) when the recommended treatment rests on the physician's misdiagnosis of the patient's condition (*Jameson v. Desta* (2013) 215 Cal.App.4th 1144, 1168-1169 (*Jameson*) [physician negligent for recommending injections that, under proper diagnosis of patient's condition, were unnecessary]; *Tortorella v. Castro* (2006) 140 Cal.App.4th 1, 3-6, 11 [physician negligent for recommending surgery that, under proper reading of MRI, was unnecessary]; *Keen v. Prisinzano* (1972) 23 Cal.App.3d 275, 281 [physician negligent for recommending casting that, under proper reading of X-ray, was better treated by pinning]), or (2) when the recommended treatment, even if based on a correct diagnosis, is one that no reasonable physician using such skill, prudence and diligence as other members of the relevant medical community would have recommended (*McCurdy v. Hatfield* (1947) 30 Cal.2d 492, 495

11

(*McCurdy*); *Mathis v. Morrissey* (1992) 11 Cal.App.4th 332, 343 (*Mathis*); *Carrasco v. Bankoff* (1963) 220 Cal.App.2d 230, 240).

The "no reasonable physician" standard flows from the nature of medical knowledge. "Medicine is not a field of absolutes" (*Mathis*, *supra*, 11 Cal.App.4th at p. 342), so "different doctors may disagree in good faith upon what would encompass the proper treatment . . . of a medical problem in a given situation" (*Barton v. Owen* (1977) 71 Cal.App.3d 484, 501-502). Because "[a] difference of medical opinion concerning the desirability of one particular medical procedure over another does not . . . establish that the determination to use"—or to recommend—"one of the procedures [is] negligent" (*Clemens v. Regents of University of Cal.* (1970) 8 Cal.App.3d 1, 13; *Mathis*, at p. 343 ["the mere fact that there is a disagreement within the relevant medical community does not establish that the selection of one procedure as opposed to the other constitutes ordinary medical negligence"]; *Meier v. Ross General Hospital* (1968) 69 Cal.2d 420, 434 ["correct[]" "rule" is that physician's choice of "one of alternative accepted methods of treatment" is not "negligent" even if "other physicians disagree"]; *Rainer*, *supra*, 18 Cal.App.3d at p. 260, fn. 22; cf. *N.N.V. v. American Assn. of Blood Banks* (1999) 75 Cal.App.4th 1358, 1393 [where "no[]" agency "recommend[s]" treatment, negligence]; *Mettias v. United States* (D. Haw. Apr. 21, 2015) 2015 U.S. Dist. LEXIS 52160, *83-*84 [negligence to recommend bariatric surgery to patient whose body mass index was too low for that surgical option]; *Sim v. Weeks* (1935) 7 Cal.App.2d 28, 37-38 [although recommendation followed by a "*respectable* minority" of physicians is not negligent, physician does not escape liability by proffering *unreasonable* physicians willing to recommend treatment], italics added;

accord, *Hubbard v. Calvin* (1978) 83 Cal.App.3d 529, 532-534 [error to instruct jury that a physician is negligent *unless* a "respectable minority" of physicians would agree with his conduct]), a physician is negligent for recommending a course of treatment only when *no* reasonable physician in the relevant medical community would do so.  (Accord, *Ross v. Kish* (2006) 145 Cal.App.4th 188, 202 [party liable for malicious prosecution of lawsuit only if "no reasonable attorney" would have recommended litigation]; *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 817 [same], superseded by statute on other grounds as stated in *Hart v. Darwish* (2017) 12 Cal.App.5th 218, 227.)

Because, as noted above, the duty of care for recommending courses of treatment is pegged to what reasonable physicians using such skill, prudence and diligence as other members in the relevant medical community would do, whether that duty was breached "'in a particular case is generally a question for experts'" except where "'the matter . . . is . . . within the common knowledge of laymen.' [citation.]"  (*Huffman v. Lindquist* (1951) 37 Cal.2d 465, 473, quoting *Trindle v. Wheeler* (1943) 23 Cal.2d 330, 333; *Jambazian v. Borden* (1994) 25 Cal.App.4th 836, 844; *Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1001.)

### 2. *The physician's duty to obtain the patient's informed consent*

Because a patient relies upon her physician's greater medical knowledge when seeking medical treatment, the physician has a fiduciary-like duty to obtain his patient's informed consent regarding which course of treatment to pursue. (*Cobbs v. Grant* (1972) 8 Cal.3d 229, 240-242, 246 (*Cobbs*); *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 129

13

(*Moore*); *Jameson, supra*, 215 Cal.App.4th at p. 1164; *Mathis, supra*, 11 Cal.App.4th at p. 339.)  A physician who fails to do so is liable for negligence.  (*Cobbs*, at pp. 240-241; *Arato v. Avedon* (1993) 5 Cal.4th 1172, 1183 (*Arato*).)  In imposing this duty, the doctrine of informed consent "injects into the established framework of negligence a concern with patient choice that would otherwise be absent."  (*Townsend v. Turk* (1990) 218 Cal.App.3d 278, 284.)

To comply with the duty to obtain a patient's informed consent, a physician must "disclose to the patient all material information—that is, 'information which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject a recommended medical procedure.'"  (*Arato, supra*, 5 Cal.4th at p. 1186, quoting BAJI No. 6.11; *id.* at p. 1175; *Cobbs, supra*, 8 Cal.3d at p. 245; *Moore, supra*, 51 Cal.3d at p. 129; *Truman v. Thomas* (1980) 27 Cal.3d 285, 291 (*Truman*).)  This standard focuses on what an objective, reasonable "prudent person" in the patient's shoes would want to know, and is therefore not dictated by whatever "custom" physicians in the relevant medical community follow when making disclosures.  (*Cobbs*, at pp. 243, 245; *Spann v. Irwin Memorial Blood Centers* (1995) 34 Cal.App.4th 644, 656 (*Spann*) [disclosure turns on what is "material to the patient's decision, regardless of the custom in the profession"].)

When a physician recommends one or more courses of treatment, the information that is "material" (and, hence, that must be disclosed in order to obtain the patient's informed consent) falls into two categories—namely, (1) "minimal" disclosures that are *always* material, and (2) "additional"

14

disclosures that *might be* material if "skilled practitioner[s] of good standing" would "provide" those disclosures "under similar circumstances." (*Cobbs*, *supra*, 8 Cal.3d at pp. 244-245; *Mathis*, *supra*, 11 Cal.App.4th at p. 343; *Daum v. Spinecare Medical Group* (1997) 52 Cal.App.4th 1285, 1301-1302 (*Daum*).) The minimal disclosures required in every case include (1) a "reasonable explanation of the [recommended] procedure[(s)]," (2) the "likelihood of success" of each recommended procedure, (3) "the risks involved in accepting [and] rejecting [each] proposed [procedure]," particularly the "potential of death or serious harm" and "the complications that might possibly occur," and (4) the physician's "personal interests" that may affect his judgment, even if "unrelated to the patient's health." (*Cobbs*, at pp. 243-245; *Vandi*, *supra*, 7 Cal.App.4th at p. 1069; *Truman*, *supra*, 27 Cal.3d at p. 292; *Daum*, at p. 1301; *Arato*, *supra*, 5 Cal.4th at p. 1184.) The "additional" disclosures that are not always required, but may be required—depending on what "skilled practitioner[s]" would do—in a particular case can include information on the procedures the physician is *not* recommending. (*Vandi*, at p. 1071; *Spann, supra*, 34 Cal.App.4th at p. 658; *Schiff, supra*, 92 Cal.App.4th at p. 701; cf. *Parris v. Sands* (1993) 21 Cal.App.4th 187, 193 [no "general duty of disclosure concerning a treatment or procedure a physician does not recommend"].) Because the focus of informed consent is on what the reasonable patient needs to know to make an intelligent choice among the available options, a physician need not give the patient a "mini-course in medical science" or a "lengthy polysyllabic discourse on all possible complications" and their statistical probabilities (*Cobbs*, at p. 244; *Arato*, at p. 1186), need not disclose information that is "commonly appreciated" (*Truman*, at p. 291), and need not

15

disclose information regarding the non-medical effects of a medical procedure (*Arato*, at pp. 1188-1189).

Because, as noted above, the duty to obtain informed consent is pegged to what a "reasonable person" in the patient's position would deem to be "material" to her medical decision-making (rather than being pegged to customs for disclosure in the profession), the decision as to what information should be disclosed is entrusted chiefly to the trier of fact, and *not* to medical experts. (*Arato, supra*, 5 Cal.4th at p. 1186; *Wilson v. Merritt* (2006) 142 Cal.App.4th 1125, 1134; *Betterton v. Leichtling* (2002) 101 Cal.App.4th 749, 756 (*Betterton*).) Thus, when it comes to liability for failing to obtain informed consent, expert testimony has a more "limited and subsidiary role" (*Arato*, at p. 1191), and is typically relevant to establish what additional information over and above minimal disclosures that reasonable physicians in the relevant medical community would make to their patients (*ibid.*; *Betterton*, at p. 756).

**B.     *Does a Physician's Compliance with the Duty to Obtain Informed Consent Obviate Liability for Non-Compliance with the Duty of Care in Recommending Courses of Treatment?***

The trial court erred in instructing the jury that Dr. Liu would "not be liable" for "negligent[ly]" recommending the gastric re-sleeve surgery "if [plaintiff] gave a fully informed consent." That is because a physician can be held liable for negligence in recommending a course of treatment[2] even if he obtains the

---

[2]     A physician's negligent recommendation necessarily entails *implementing* that recommendation; otherwise, there would be no causal link between the recommendation and injury to the plaintiff. Thus, plaintiff's attempt to splice her medical negligence claim even further on appeal by arguing that the

16

patient's informed consent to that negligently recommended course of treatment. We reach this conclusion for two reasons.

First, this conclusion is dictated by the disparity in medical knowledge between the physician and the patient. (*Cobbs*, *supra*, 8 Cal.3d at p. 242.) Even if a physician discloses to a patient all the pros and cons of a particular course of treatment, the patient almost invariably lacks the medical knowledge to know whether that course of treatment is a medically reasonable one or not. Take an example: Dr. Feelbad's full disclosure of the pros and cons of ingesting Draino as a means of clearing a stomach blockage does not render that recommended treatment any less medically unsound. Just as a patron's fully knowledgeable selection of one entrée over another does not say anything about which entrees should be on the menu in the first place, a patient's fully knowledgeable selection of a particular course of treatment does not say anything about whether the physician was negligent for recommending that course of treatment in the first place.

Second, this conclusion is strongly suggested by precedent. In *Valdez v. Percy* (1950) 35 Cal.2d 338 (*Valdez*), our Supreme Court held that a patient's "prior consent" to a course of treatment flowing from a misdiagnosis "did not relieve the defendant from liability" for that misdiagnosis. (*Id.* at pp. 341-343.) *Valdez*'s logic applies with equal force to *all* negligent recommendations, regardless of whether they stem from misdiagnosis. Dr. Liu cites *Hooker v. Headley* (Ga. Ct. App. 1989) 385 S.E.2d 732, 733 (*Hooker*), for the proposition that a patient's

---

negligent recommendation theory encompasses *both* Dr. Liu's recommendation that plaintiff undergo the gastric re-sleeve surgery *and* Dr. Liu's consequent decision to perform the surgery he recommended adds nothing to the analysis.

17

informed consent to a procedure can negate a doctor's liability for negligently recommending that procedure. *Hooker* appears to support this proposition, but we decline to follow *Hooker* for the reasons set forth above.

## II.    Did the Incorrect Supplemental Jury Instruction Prejudice Plaintiff?

The trial court's erroneous instruction told the jury that a finding for Dr. Liu on informed consent would absolve him of any liability for negligently recommending gastric re-sleeve surgery in the first place. To assess whether that erroneous instruction prejudicially affected plaintiff's single claim for negligence that was premised on *both* theories of liability, we must ask two questions. First, we must ask whether a jury finding for Dr. Liu on the informed consent theory is supported by substantial evidence and otherwise unaffected by error. (Accord, *Bresnahan v. Chrysler Corp.* (1998) 65 Cal.App.4th 1149, 1153 [general verdict will not be disturbed if "'a single one of'" "'several counts or issues . . . tried'" "'is supported by substantial evidence'" and "'is unaffected by error'"]; *David v. Hernandez* (2014) 226 Cal.App.4th 578, 586 [same].) If the jury finding on the informed consent theory is invalid as an evidentiary or legal matter, then a "not negligent" verdict for Dr. Liu premised on the supersession of that theory over the negligent recommendation theory would also be invalid; reversal and remand would be required. Second, and if the jury's informed consent finding for Dr. Liu is valid, we must ask whether the supplemental instruction that this finding would absolve Dr. Liu of liability for negligently recommending the gastric re-sleeve surgery tainted the jury's evaluation of plaintiff's negligent recommendation theory.

18

**A.** *Is the jury verdict on the informed consent theory valid?*

As noted above, a physician can be found liable for negligence for failing to obtain a patient's informed consent if (1) the physician failed to "disclose to the patient all material information—that is, 'information which the physician knows or should know would be regarded as significant by a reasonable person in the [plaintiff-patient's] position,'" and (2) that failure proximately caused the plaintiff-patient harm. (*Arato*, *supra*, 5 Cal.4th at p. 1186; *Burgess*, *supra*, 2 Cal.4th at p. 1082.)

In evaluating the evidentiary validity of a jury's verdict, our task is merely to assess whether the record contains "substantial evidence, contradicted or uncontradicted, which will support" the verdict. (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 681.) In assessing the substantiality of the evidence, we "review the record in the light most favorable to the" verdict, resolve all conflicts in favor of the verdict, and draw all reasonable inferences in favor of the verdict. (*King v. State of California* (2015) 242 Cal.App.4th 265, 278-279.) Through this prism, we may not reweigh the evidence (*In re I.J.* (2013) 56 Cal.4th 766, 773 [""We do not reweigh the evidence or exercise independent judgment"""]) and the testimony of a single witness can constitute substantial evidence (*People v. Lewis* (2001) 25 Cal.4th 610, 646).

Substantial evidence supports the jury's verdict that Dr. Liu disclosed to plaintiff all information that a reasonable person in plaintiff's position should know when making a decision regarding gastric re-sleeving surgery. Specifically, Dr. Liu made all of the pertinent "minimal" disclosures: He explained to her what the gastric re-sleeve surgery entailed, disclosed to her that success with weight loss would depend upon her renewed

19

dedication to diet and exercise, and disclosed to her that the surgery carried with it a risk of "staple line leakage" or similar complications that Dr. Liu believed to be only 5 percent likely. Although Dr. Liu did not specifically inform plaintiff that the likelihood of complications from the gastric re-sleeve surgery was *5 percent*, the disclosure of statistical probabilities is not invariably a prerequisite to informed consent. (*Cobbs*, *supra*, 8 Cal.3d at p. 244; *Arato*, *supra*, 5 Cal.4th at p. 1186.) And while Dr. Liu testified that he believed the risk of complications to be "the same" for both the initial gastric sleeve and the gastric re-sleeve surgeries, this belief had no effect on the jury's finding that plaintiff gave informed consent because (1) both parties' experts agreed that the risk of complications for gastric re-sleeve surgery was, in fact, 5 percent (and, hence, that Dr. Liu's appraisal of the risk was correct), and (2) the statistical likelihood of complications did not need to be disclosed anyway.[3]

Plaintiff proffers three reasons why the jury's verdict that Dr. Liu obtained her informed consent is invalid.

First, she contends that substantial evidence in the record would support a verdict in her favor on this theory. We need not evaluate whether this is true because this contention applies the incorrect legal standard. Where, as here, it is the *plaintiff* asserting on appeal that a *defense* verdict is not supported by the

---

[3] If anything, Dr. Liu *over-estimated* the risk of complications from the initial gastric sleeve surgery, given that both experts testified that the risk of complications for an initial gastric sleeve surgery was 0.5 percent while the risk for gastric re-sleeve surgery was ten times greater and thus 5 percent. Dr. Liu's over-estimation of risk for the prior, initial sleeve surgery does not undermine his accurate disclosure of risk for the re-sleeve surgery at issue in this case.

evidence, it is the plaintiff's burden to show on appeal that there is *no* substantial evidence to support that defense verdict, and not merely that substantial evidence would have supported a verdict in her favor. (*Lobo v. Tamco* (2014) 230 Cal.App.4th 438, 442, fn. 2; *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465-466; *Agam v. Gavra* (2015) 236 Cal.App.4th 91, 108.) As explained above, plaintiff has not carried this onerous burden.

Second, plaintiff points out two deficiencies in the proof. She notes the patient consent form she filled out does not automatically establish informed consent. This is true (*Quintanilla v. Dunkelman* (2005) 133 Cal.App.4th 95, 116 ["a signed form" is not "conclusive proof that informed consent was given"]), but irrelevant because we must indulge the reasonable inference that it constitutes informed consent in this case *and* because Dr. Liu testified that he also had oral discussions with plaintiff regarding the pros and cons of gastric re-sleeve surgery. Plaintiff further observes that a physician must disclose (1) the risks of a surgery, and (2) a separate "risk-benefit analysis." Once again, plaintiff is correct that the minimal disclosures necessary to obtain informed consent include a "risk-benefit analysis" insofar as the physician must disclose the "likelihood of success" as well as the attendant risks (*Cobbs*, *supra*, 8 Cal.3d at pp. 243-245; *Vandi*, *supra*, 7 Cal.App.4th at p. 1069; *Truman*, *supra*, 27 Cal.3d at p. 292; *Daum*, *supra*, 52 Cal.App.4th at p. 1301; *Arato*, *supra*, 5 Cal.4th at p. 1184), but this observation is of no moment because Dr. Liu *did* discuss what would be needed for success as well as the risks. Because plaintiff's likelihood of success at weight loss was directly contingent upon *plaintiff*'s volitional choices (and, in light of plaintiff's concession that the

21

gastric re-sleeve surgery was performed competently, was *solely* contingent upon her choices), Dr. Liu's disclosure of what she would need to do was sufficient to satisfy his disclosure obligation; he was not required to estimate—or, as discussed more fully below, to discount—how likely it was that *she* would heed his advice.

Lastly, plaintiff suggests that the trial court wrongly placed the burden on *her* to prove the lack of informed consent because, in her view, informed consent is an affirmative defense that a physician must prove. Plaintiff is wrong. Because she is the plaintiff suing for negligence (*Arato*, *supra*, 5 Cal.4th at p. 1183 [informed consent is a theory of negligence]), *she* bears the burden of proving the elements of every legal theory she proffers in support of that negligence claim—including her informed consent theory. (Evid. Code, § 500; *Cobbs*, *supra*, 8 Cal.3d at p. 245; *Mathis*, *supra*, 11 Cal.App.4th at p. 346; accord, CACI No. 533.) To be sure, there is language in *Cobbs* indicating that the "burden of going forward with evidence of nondisclosure" rests initially with the plaintiff but "shifts to the physician" "[o]nce such evidence has been produced." (*Cobbs*, at p. 245.) But the "burden of going forward" is different from the "burden of proof," and the burden of proof *always* remains with the plaintiff. (*Mathis*, at pp. 346-347.) Indeed, the only time the burden of proof on informed consent shifts to the defendant-physician is *after* the plaintiff has carried her burden of showing the nondisclosure of material information *and* when the defendant-physician is attempting to prove that "even though a reasonably prudent person might not have undergone the procedure if properly informed of the perils, *this particular plaintiff* still

22

would have consented to the procedure." (*Warren v. Schecter* (1997) 57 Cal.App.4th 1189, 1206, italics added.)

**B.** ***Did the supplemental instruction telling the jury that plaintiff's informed consent obviated Dr. Liu's liability on a negligent recommendation theory prejudice plaintiff?***

In assessing whether an erroneous supplemental jury instruction was prejudicial, appellate courts ask whether, without that error, a result more favorable to the appealing party was reasonably probable. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) A more favorable result on a theory of liability due to an error in jury instructions on that theory is not reasonably probable if that theory should never have gone to the jury in the first place. (E.g., *California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 35.) A theory of liability should be kept from the jury—whether after opening statements in a motion for nonsuit, after the close of evidence in a motion for a directed verdict, or after the verdict in a motion for judgment notwithstanding the verdict—only when the evidence, viewed in the light most favorable to the plaintiff, is not "substantial" enough to support a verdict in the plaintiff's favor, such that there is no "negligence as a matter of law." (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110; *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68; *Parker v. James E. Granger, Inc.* (1935) 4 Cal.2d 668, 678; *People v. Severance* (2006) 138 Cal.App.4th 305, 319-320; *Rotman v. Maclin Markets, Inc.* (1994) 24 Cal.App.4th 1709, 1712-1713; accord, *Morales*, *supra*, 1 Cal.App.5th at p. 525 [assessing prejudice arising from an erroneous jury instruction by "view[ing] the evidence in the light most favorable to the losing party"].)

As noted above, a physician can be found liable for negligently recommending a course of treatment if (1) his recommendation is based on a misdiagnosis of the plaintiff's medical condition, or (2) his recommendation, even if based on an accurate diagnosis, is one that no reasonable physician using such skill, prudence and diligence as other members of the relevant medical community would recommend for the plaintiff. (*Jameson*, *supra*, 215 Cal.App.4th at pp. 1168-1169; *McCurdy*, *supra*, 30 Cal.2d at 495.)

The trial court should not have submitted plaintiff's negligent recommendation theory to the jury because the evidence, viewed in the light most favorable to plaintiff, does not support that Dr. Liu was negligent in recommending that plaintiff undergo the gastric re-sleeve surgery.

There was no evidence whatsoever that Dr. Liu misdiagnosed plaintiff's condition; indeed, it was uncontested that plaintiff suffered from morbid obesity.

There was also not substantial evidence that "no reasonable physician" would have recommended the gastric re-sleeve surgery to plaintiff. We reach this conclusion for two reasons.

First, there is no evidence that gastric re-sleeve surgery is generally verboten. Indeed, both expert witnesses and Dr. Liu all testified that they had performed gastric re-sleeve surgeries. As a result, the evidence does not show that "no reasonable physician" would *ever* perform this surgery.

Second, there is no substantial evidence that all reasonable physicians would have rejected gastric re-sleeve surgery as a viable option *for plaintiff* on the facts of this case. Whether a reasonable physician would recommend a course of treatment is a

function of weighing the treatment's probable benefits against its probable risks. This balance is assessed by looking to the particular risk or benefit and their respective likelihoods.

There is no evidence that Dr. Liu incorrectly assessed the probable risks of the gastric re-sleeve surgery to plaintiff—or, more to the point, that no reasonable physician would have assessed the probable risks in the same way Dr. Liu did. That is because both experts agreed with Dr. Liu's assessment that plaintiff faced a 5 percent risk of complications, including leakage, from the re-sleeve surgery.

There is also no evidence that Dr. Liu incorrectly assessed the probable benefits of gastric re-sleeve surgery to plaintiff—or, more to the point, that no reasonable physician would have assessed the probable benefits in the same way Dr. Liu did. It was uncontested that Dr. Liu correctly understood the *benefits* gastric re-sleeve surgery can confer if it assists with weight loss. Those benefits generally include reduced risk of diabetes, high blood pressure and sleep apnea, although plaintiff herself did not suffer from those additional complications. It was also uncontested that that Dr. Liu correctly understood that the *likelihood* of these benefits coming to pass for this type of elective surgery was a function of *both* (1) his medical skill in performing the surgery, *and* (2) plaintiff's volitional choices in sticking to a diet and exercising. (See, e.g., *Anglin v. Grisamore* (Ga. Ct. App. 1989) 386 S.E.2d 52, 53 [noting that success with weight-loss surgeries turns on the "[]willingness" of the patient "to restrict her diet post operatively in accordance with the instructions given to her"].) Because it is uncontested that Dr. Liu competently performed the gastric re-sleeve surgery, the

25

likelihood of plaintiff achieving the benefits of this surgery in this case was entirely a matter of her own volitional choices.

Plaintiff urges that no reasonable physician would have pegged her likelihood of sticking to a diet at anything above zero given her prior failures. We disagree. Where, as here, a plaintiff tells her physician that she—despite prior failures—desires to try again in losing weight, a physician does not act unreasonably in giving her that opportunity. The fundamental premise of the physician-patient relationship is that—once all material information is disclosed—the *patient* gets to decide which medically reasonable course of treatment to pursue. (*Cobbs*, *supra*, 8 Cal.3d at p. 244 ["the decision whether or not to undertake treatment is vested in the party most directly affected: the patient"]; *Arato*, *supra*, 5 Cal.4th at p. 1184 [noting the "medical patient's protectible interest in autonomous decisionmaking"]; *Moore, supra*, 51 Cal.3d at pp. 129, 143; *Thor v. Superior Court* (1993) 5 Cal.4th 725, 735; *Truman, supra*, 27 Cal.3d at p. 292.) If prior failure at complying with diets was sufficient by itself to render a surgical course of treatment unreasonable, then patients would be deprived of that choice and, what is more, nearly every recommendation to pursue an elective weight-loss surgery would be negligent because most patients only seek out those surgeries after lesser efforts at dieting have failed. Because a patient's prior failures at weight loss do not reduce the likelihood of losing weight following an elective weight-loss surgery to zero, the probable benefits of gastric re-sleeve surgery may logically offset the probable risks, and reasonable physicians can still recommend such a surgery. Consequently, plaintiff's negligent recommendation theory—

26

because it requires some evidence that *no* reasonable physician could so recommend—should not have been given to the jury.

Plaintiff makes two further arguments as to why the evidence was substantial enough to support her negligent recommendation theory.

First, she asserts that her expert opined that no reasonable physician would recommend gastric re-sleeve surgery for plaintiff. Her expert's opinion, however, rests upon an assumption that we have rejected—namely, that plaintiff's prior weight loss failures meant that the likelihood of future weight loss success was zero. Accordingly, it cannot constitute substantial evidence. (E.g., *Wise v. DLA Piper LLP (US)* (2013) 220 Cal.App.4th 1180, 1191-1192 [expert opinion based on "'assumptions . . . not supported by the record'" do not constitute "substantial evidence"].)

Second, plaintiff contends that no reasonable physician would have recommended a gastric re-sleeve surgery for plaintiff without doing another multi-disciplinary work-up of plaintiff, as her expert opined that a "majority" of bariatric surgeons would do. Even if we ignored that there is no negligence for recommending a course of treatment as long as *some* reasonable physicians would support the recommendation (even if they do not constitute a majority), plaintiff has presented absolutely no evidence that a further work-up would have produced any information counseling against gastric re-sleeve surgery. Absent such evidence, there is no causal link between any negligence by Dr. Liu and any injury to plaintiff and the theory still should not have been presented to the jury. (*Jameson*, *supra*, 215 Cal.App.4th at p. 1166 [case should go to the jury only if there is "'sufficient'" "'evidence'" "'to allow the jury to infer that in the

absence of the defendant's negligence, there was a reasonable medical probability the plaintiff would have obtained a better result'"]; *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1118 [directed verdict taking case away from the jury is warranted where evidence shows a """mere possibility of . . . causation [or where] the probabilities are at best evenly balanced"""].) All plaintiff presented is the opinion of her expert that the work-up *might* have revealed contraindications explaining her weight loss failures; it is well established, however, that such speculation does not constitute substantial evidence that would justify sending the negligent recommendation theory to the jury. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 775 ["proof of causation cannot be based on . . . an expert's opinion based on inferences, speculation and conjecture"]; *People v. Ramon* (2009) 175 Cal.App.4th 843, 851 ["[s]peculation is not substantial evidence"].)

## DISPOSITION

The judgment is affirmed. The parties are to bear their own costs on appeal.

## **CERTIFIED FOR PUBLICATION**.


_____, J.
HOFFSTADT

We concur:

_____, P. J.
LUI

_____, J.
ASHMANN-GERST

28